AO 106 (REV. 4/10) Affidavit for Search Warrant

AUSA Adam L. Rosenbloom, (312) 353-0962

**FILED**
11/4/2022
TD
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case No. 22M873

The digital images of two cellular telephones, further
described in Attachment A

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Nathaniel T. Day, a Special Agent of the Drug Enforcement Administration, request a search warrant and

state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 | narcotics offenses |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

NATHANIEL T. DAY, Special Agent
Drug Enforcement Administration
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent
provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: November 4, 2022          9:00am          _____
*Judge's signature*

City and State: Chicago, Illinois          JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
                                            )
NORTHERN DISTRICT OF ILLINOIS     )

### AFFIDAVIT

I, Nathaniel T. Day, being duly sworn, state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration. I have been so employed since approximately September 2021.

2.      As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.      I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.      I have participated in investigations that have led to the issuance of search warrants involving violations of narcotics laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives; "stash houses" (houses used as drug/money storage locations); storage facilities; bank

safe deposit boxes; cellular/camera phones; and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.     This affidavit is made in support of an application for a warrant to search the digital images from (1) a white iPhone 12, bearing serial number DNPDW3650DXQ and phone number 773-XXX-9296 ("**Subject Phone 1**"); and (2) a silver and white iPhone 7, bearing serial number DNPV42XXHG7G with phone number 312-XXX-6086 ("**Subject Phone 2**" and collectively, the "**Subject Phones**") for evidence and instrumentalities described further in Attachment B, concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841 (the "**Subject Offenses**").

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel, from persons with knowledge regarding relevant facts, and from discussions with a DEA confidential source (CS-1).[1] Because this affidavit is being submitted for the limited

---

[1] CS-1 has been cooperating with law enforcement since 2013. CS-1 is an undocumented alien in removal proceedings. CS-1 is cooperating with law enforcement in hopes of receiving immigration benefits for his cooperation as well as in exchange for monetary compensation. To date, CS-1 has been paid approximately $20,700. I believe the information provided by CS-1 set forth in this affidavit is reliable because CS-1 has provided reliable information in the past that has been independently corroborated through consensually recorded phone calls, surveillance, and other information described in this affidavit. CS-1 has one felony

purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of the **Subject Offenses** are located within the digital images of the **Subject Phones**.

## I. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONES

7. As explained below, on October 24, 2022, during the arrest of SIR CARL JEFFREY MOMAN, JR., law enforcement recovered two cellular telephones – namely (1) **Subject Phone 1** and (2) **Subject Phone 2**. After being advised of his *Miranda* rights, MOMAN signed written consent forms allowing law enforcement agents to search the **Subject Phones**. Law enforcement agents created digital copies of the **Subject Phones** and returned the physical **Subject Phones** to MOMAN's

---

conviction for possession of a controlled substance from approximately 24 years ago and two misdemeanor convictions from 2000 and 2005.

The statements made and information provided to law enforcement by CS-1 are summaries or based on draft and not verbatim transcriptions of any statements. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points in this affidavit, I also have indicated (in brackets) my interpretation of words and phrases used in the recorded conversations. My summaries and interpretations also are based on the context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

residence on or about October 25, 2022.[2]  MOMAN subsequently withdrew consent to search the **Subject Phones** on October 27, 2022.

## *Background*

8.      According to CS-1, on or about March 26, 2022, CS-1 overheard MOMAN on a phone call with an unknown individual discussing MOMAN's ability to buy and sell pills.[3] CS-1 asked MOMAN what kinds of pills he sold. MOMAN told CS-1 that he sold all kinds of pills and showed CS-1 photos of pills on his cellular phone. CS-1 informed law enforcement agents that MOMAN advised CS-1 that MOMAN would sell pills to CS-1 for $10 and expected that CS-1 could sell them for $20. MOMAN informed CS-1 that his phone number was 773-XXX-9296 (**Subject Phone 1**). Law enforcement directed CS-1 to contact MOMAN on **Subject Phone 1**, as described below.

---

[2] MOMAN was not present at his residence when agents returned the phones. MOMAN's brother was present and received the phones.

[3] The identification of MOMAN and MOMAN's voice in this affidavit is based, in part, on the following: Utilizing various law enforcement databases, law enforcement was able to determine subscriber information for the Moman 9296 Phone Number number, which returned to Sir Carl MOMAN of 5328 W Grace Street, Chicago, Illinois 60641. CS-1 had previously known MOMAN by the name of "Sir." Law enforcement provided CS-1 with a driver license photograph of MOMAN, and CS-1 confirmed the individual in the photograph was the same individual he/she was acquainted with and knew by the name of "Sir." During the calls between CS-1 and the user of the Moman 9296 Phone Number and the Moman 6086 Phone Number, they arranged an in-person meeting, which took place on or about September 28, 2022, as described below. At that meeting, law enforcement observed that CS-1 met with an individual, whom agents were able to visually identify as MOMAN, based on MOMAN's driver license photograph.

### *September 28, 2022 Transaction*

9.      On or about September 26, 2022, CS-1 placed a call to **Subject Phone 1**. The telephone call was recorded and made in the presence of law enforcement. During that call, a person whose voice CS-1 recognized as MOMAN agreed to sell CS-1 100 pills for $1,000 on or about Wednesday, September 28, 2022. During the call, MOMAN told CS-1 he would reach back out to him/her on a different phone, closer to the deal.

10.      On the morning of September 27, 2022, CS-1 received a call from a different number, **Subject Phone 2**. During the call, a person whose voice CS-1 recognized as MOMAN discussed a location for the transaction in Cicero, Illinois. I have listened to a recording of this call, and I believe the person whose voice was recorded making calls from **Subject Phone 2** is the same person whose voice was recorded making calls from **Subject Phone 1**.

11.      On or about September 28, 2022, CS-1 received a call from **Subject Phone 2**. The telephone call was recorded. During the call, MOMAN indicated he would not be able to reach the agreed upon location because of car trouble. During the recorded call, MOMAN said he was in a gas station parking lot and that his car was immobile. CS-1 asked MOMAN to text CS-1 the address of the gas station. CS-1 received a text message from **Subject Phone 2** with a link to a location at the intersection of West Division Street and Noble Street in Chicago, Illinois. CS-1 provided an image of this text to law enforcement.

5

12.    Agents searched CS-1 for contraband or excess contraband and narcotics and found none. Agents also equipped CS-1 with audio and video recording equipment and activated the device. Agents surveilled CS-1 as CS-1 drove to a gas station located on the 1300 block of West Division Street in Chicago, Illinois. Law enforcement observed CS-1 meet with an individual law enforcement determined was MOMAN, based on a comparison with a driver's license photograph of MOMAN.

13.    More specifically, while CS-1 was at the gas station, at approximately 1:11 p.m., law enforcement agents conducting surveillance observed MOMAN arrive and sit inside the rear seat of CS-1's vehicle. According to CS-1, MOMAN provided CS-1 a plastic bag containing approximately 100 pills in exchange for $1,000. Law enforcement surveilled CS-1 back to a neutral location and searched CS-1. Law enforcement seized a plastic bag containing blue and yellow pills from CS-1. Agents conducted a field test of the pills, which indicated positive for the presence of 3,4-methylenedioxymethamphetamine (MDMA).

### *October 24, 2022 Transaction*

14.    On or about October 14, 2022, CS-1 placed a recorded call to **Subject Phone 2**. During the phone conversation, CS-1 told MOMAN that the quality of the prior purchase was very good, and CS-1 asked whether MOMAN could provide a greater quantity of the same product. MOMAN answered in the affirmative and asked what quantity CS-1 wanted to buy. CS-1 asked if MOMAN could supply 1,000 of the same product. MOMAN said yes and stated that the price would be "like 10,000 [dollars]." CS-1 asked if MOMAN could give CS-1 a better price based on the greater

6

volume of this purchase. MOMAN said, "if I give you something cheaper I could give you a better price, alright, but it's not going to be as good as the other shit." MOMAN agreed to sell CS-1 1,000 for $10,000 dollars. MOMAN told CS-1 that he would need some time to acquire the product. Based on my training and experience, the training and experience of other agents involved in the investigation, and the context of the conversation, I believe MOMAN's reference to "1,000" on the call was a reference to 1,000 pills containing narcotics. CS-1 and MOMAN agreed to speak on or about October 17, 2022 to discuss logistics for the transaction.

15.    On or about October 19, 2022, CS-1 received a call from **Subject Phone 2**. CS-1 initially did not answer, but called **Subject Phone 2** back. During the call, MOMAN asked when CS-1 wanted to "have the business." MOMAN told CS-1 that MOMAN was going to "get in an order" by the following day (October 20, 2022). MOMAN told CS-1 that he should "come in with the money, right? I don't want to meet nobody else, bro." MOMAN told CS-1 to bring the money and MOMAN would bring the "merch." Based on my training and experience, the training and experience of other agents involved in the investigation, and the context of the conversation, I believe the "merch" was a reference to narcotics.

16.    On or about October 20, 2022, MOMAN sent a text message from **Subject Phone 2** to CS-1 that CS-1 provided to law enforcement. The text message stated, "Call me I got everything ready but its going to sell fast." CS-1 did not respond. Approximately four hours later, MOMAN texted CS-1 again: "Nevermind buddy.  U

7

make me grab 1000 for nothing." CS-1 responded indicating that CS-1 would call MOMAN shortly. According to CS-1, CS-1 had an unrecorded call with MOMAN on October 20, 2022. CS-1 informed law enforcement that during the call MOMAN told CS-1 that MOMAN was in possession of the 1000 pills and said words to the effect that "I have it waiting for you." MOMAN and CS-1 agreed to a meeting on Monday October 24, 2022 and to communicate again on Sunday October 23, 2022 to confirm the details of the October 24, 2022 meeting.

17. According to CS-1, on or about Sunday, October 23, 2022, CS-1 received a text message from **Subject Phone 2** that stated: "buddy im going to atlanta monday night I wont be back until 2 weeks." On the same date, CS-1 placed a recorded call to the **Subject Phone 2**. During the call, MOMAN asked whether CS-1 received his text indicating that he had to go out of town. MOMAN and CS-1 discussed logistics for a subsequent meeting. MOMAN asked "you want it for sure?" CS-1 answered in the affirmative and discussed when he would be available the following day. MOMAN said, "just let me know, bro. I'm on point for you already." CS-1 asked if MOMAN could meet at a store parking lot in Cicero, Illinois. MOMAN responded "hell no, bro. I've gotta–I'm taking more of a risk. You don't got nothing but money, like only cash. … I told you last time, since you coming for 1,000 you got to come to me so I can feel comfortable." MOMAN said he would text CS-1 the location for a grocery store parking lot where they could meet. Later that evening, MOMAN texted CS-1 the

8

address of a grocery store on the 1500 block of North Kingsbury Street in Chicago, Illinois ("Grocery Store A").

18.     On or about Monday, October 24, 2022 at 11:59 AM, CS-1 placed a call to **Subject Phone 2**. During the call, MOMAN told CS-1 that MOMAN would be able to meet CS-1 at approximately 2:00 p.m. to 2:30 p.m.

19.     At approximately 2:21 p.m., CS-1 place a recorded call to **Subject Phone 2**. During this call, MOMAN informed the CS that MOMAN was in an Uber and 15 to 20 minutes away. CS-1 also asked MOMAN if MOMAN "Had the stuff" with him. MOMAN answered in the affirmative to CS-1's question.

20.     At approximately 2:55 p.m., CS-1 place a recorded call to **Subject Phone 2**. During this call, MOMAN said he "took the wrong way, so we pulling up in like ten minutes." MOMAN asked CS-1 to confirm he was at Grocery Store A. CS-1 said he was at Grocery Store A and told MOMAN that he/she was on the rooftop.

21.     According to law enforcement agents conducting surveillance on MOMAN's residence, an individual who appeared to be MOMAN exited the building and entered the rear seat of a blue sedan at approximately 3:02 p.m. Law enforcement agents in unmarked vehicles continued surveillance of the vehicle as it travelled eastbound.

22.     At approximately 3:24 p.m., law enforcement aerial surveillance observed the vehicle in which MOMAN was traveling pull into the parking lot of Grocery Store A from North Kingsbury Street. According to the aerial surveillance

9

footage, MOMAN exited from the rear driver side door holding a brown paper bag. Law enforcement agents observed MOMAN enter the floor level of Grocery Store A. MOMAN was out of view of law enforcement for approximately 90 seconds minutes while inside the store.

23.     Law enforcement agents observed MOMAN entering the roof deck parking lot of Grocery Store A at approximately 3:26 p.m. According to aerial surveillance footage and law enforcement agents present at Grocery Store A, MOMAN was carrying a bag that appeared to be same brown paper bag at the time he exited the store onto the roof deck parking lot.

24.     Law enforcement agents also observed that MOMAN appeared to make a phone call as he entered the parking lot. At approximately 3:26 PM, CS-1 received a recorded call from **Subject Phone 2**.[4] According to the recording of this call and law enforcement agents who were physically present with CS-1 at the time of the call, MOMAN asked CS-1 where he was, and CS-1 told MOMAN that CS-1 was "right here." According to the audio recording of the call and aerial surveillance footage, law enforcement agents at Grocery Store A announced their presence and approached MOMAN in unmarked vehicles with emergency equipment activated while MOMAN was still on the phone with CS-1. MOMAN then turned and attempted to flee on foot to the area from which MOMAN had entered the parking lot.

---

[4] CS-1 was with law enforcement agents at this time, but was not physically present at Grocery Store A.

25.     While fleeing on foot, MOMAN threw the brown paper bag over the edge of the building. Aerial surveillance observed the brown paper bag falling from the rooftop parking lot, and law enforcement agents recovered the bag from the street below. The brown paper bag contained a cardboard box with ten separate plastic bags inside. According to law enforcement agents who recovered the bag, the cardboard box bore an address label with MOMAN's home address and the name of MOMAN's mother.[5] The ten plastic bags inside the cardboard box contained pink and blue square tablets/pills.

26.     Agents conducted a field test of the pink and blue tablets/pills, which indicated positive for the presence of 3,4-methylenedioxymethamphetamine (MDMA).

27.     MOMAN continued to flee on foot and was apprehended by law enforcement.

28.     During a search incident to arrest of MOMAN's person, law enforcement agents recovered a .40 caliber Glock 23 handgun in a holster from the left interior breast pocket of MOMAN's jacket. The handgun contained a loaded magazine with no ammunition in the chamber.

29.     Law enforcement also recovered the **Subject Phones** from MOMAN's person. After the **Subject Phones** had been removed from MOMAN's person during

---

[5] I understand based on statements of MOMAN's mother during a post-arrest consent search of MOMAN's residence that MOMAN shares an address with his mother.

the search incident to arrest, MOMAN asked law enforcement agents present words to the effect of "You got my phones?"

### Post-Arrest Interview

30.    Law enforcement agents transported MOMAN to the Berwyn Police Department for processing. While at the Berwyn Police Department, MOMAN was placed in an audio/video recorded interview room. According to the recording of the interview, law enforcement agents read MOMAN a *Miranda* warning. MOMAN stated "you can request an attorney" at approximately 6:07 p.m. Law enforcement terminated the interview and collected basic personal identifying information from MOMAN. MOMAN reinitiated communications with law enforcement and stated that he wanted to continue the interview. Law enforcement again read MOMAN *Miranda* warnings. MOMAN stated he understood his *Miranda* rights and agreed to answer questions.

31.    MOMAN signed a written DEA consent form for the **Subject Phones**. Specifically, MOMAN consented to the search of **Subject Phone 1** and **Subject Phone 2**.

32.    At the conclusion of the interview, law enforcement agents released MOMAN from custody on the evening of October 24, 2022.

33.    Law enforcement agents created digital images of the **Subject Phones** to facilitate the consensual search of the phones. Law enforcement agents returned the physical **Subject Phones** to MOMAN's residence on or about October 25, 2022.

12

34. On October 27, 2022, MOMAN withdrew his consent to search the **Subject Phones**. Law enforcement agents ceased searching the digital images of the **Subject Phones** at that time.

35. Since on or about October 25, 2022, digital images of the **Subject Phones** have been in the government's custody.

36. At the time of arrest, data stored on the **Subject Phones**, including text and voice mail messages sent and received by MOMAN during the course of the commission of the narcotics trafficking offenses, were not known.

37. Based upon my training and experience, I know that cellular phones may contain relevant evidence of the narcotics trafficking offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the narcotics trafficking offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the narcotics trafficking offenses. Digital photographs stored in the **Subject Phones** may also contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

13

38.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

39.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone

14

may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

40.     Based on my training and experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate. For example, MOMAN communicated extensively via cellular telephone with CS-1 in the course of the **Subject Offenses**. Individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with the target in this case, because there was telephonic communication between participants involved in the **Subject Offenses**, and because, in my experience and in the experience of other agents, defendants use telephones to contact suppliers or co-conspirators, there is probable cause to believe

15

the digital images of the **Subject Phones**, described further in Attachment A,
contain evidence of violations of narcotics offenses.

## II.  PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

41.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure,
this warrant will authorize the removal of electronic storage media and copying of
electronically stored information found in the premises described in Attachment A so
that they may be reviewed in a secure environment for information consistent with
the warrant. That review shall be conducted pursuant to the following protocol.

42.     The review of electronically stored information and electronic storage
media removed from the premises described in Attachment A may include the
following techniques (the following is a non-exclusive list, and the government may
use other procedures that, like those listed below, minimize the review of information
not within the list of items to be seized as set forth herein):

a.       examination of all the data contained in such computer hardware,
computer software, and/or memory storage devices to determine whether that data
falls within the items to be seized as set forth in Attachment B;

b.       searching for and attempting to recover any deleted, hidden, or
encrypted data to determine whether that data falls within the list of items to be
seized as set forth in Attachment B (any data that is encrypted and unreadable will
not be returned unless law enforcement personnel have determined that the data is
not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3)

16

contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

        c.        surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

        d.        opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

## III.   CONCLUSION

43.    Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841, have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the digital images of the **Subject Phones**, as further described in Attachment A.

I therefore respectfully request that this Court issue a search warrant for the digital images of the **Subject Phones** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Nathaniel T. Day
Special Agent
Drug Enforcement Administration

Sworn to and affirmed by telephone 4th day of November, 2022

_____
Honorable JEFFREY COLE
United States Magistrate Judge

18

## ATTACHMENT A

## DESCRIPTION OF ITEMS TO BE SEARCHED

The digital images of the cellular telephones identified as follows:

1) a white iPhone 12, bearing serial number DNPDW3650DXQ with phone

   number 773-XXX-9296 assigned; and

2) a silver and white iPhone 7, with serial number DNPV42XXHG7G with

   phone number 312-XXX-6086 assigned.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning violation of Title 21, United States Code, Sections 841 (the **Subject Offenses**), as follows:

1.      Communications and messages concerning the ordering, purchase, manufacture, importation, storage, distribution, sale, and transportation of narcotics; the collection of cash drug proceeds, and the receipt, use, or disposition of drug proceeds;

2.      Information tending to identify the names, aliases, nicknames, telephone numbers, email and IP addresses and other contact information of suppliers, workers, couriers, customers, coconspirators, and accomplices in the **Subject Offenses**;

3.      Information concerning telephone calls related to the **Subject Offenses**;

4.      Photographs, videos, and electronic or digital images depicting the user of the cell phone or the user's associates, including persons involved in or knowledgeable about the **Subject Offenses**, locations at which the **Subject Offenses** were committed, drugs intended for distribution, instrumentalities, such as firearms, used to commit the **Subject Offenses**, and assets purchased with cash drug proceeds;

5.      Location information including GPS coordinates, location information embedded in images and videos, map searches, and requests for directions related to the **Subject Offenses**; and

6.      Information that tends to identify the user(s) of, or person(s) with control over or access to the **Subject Phone** or the telephone number assigned to the **Subject Phone**.

# ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including images of cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.